UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| GO NEW YORK TOURS INC., <br><br>                               Plaintiff, <br><br>                               v. <br><br> AURORA TOURISM SERVICES INC., and OLUWABAMISE JEGEDE, <br><br>                               Defendants. | 22-CV-10633 (RA) <br><br> MEMORANDUM <br> OPINION & ORDER |

RONNIE ABRAMS, United States District Judge:

      This action arises from the rough-and-tumble world of tourist ticket sales in Times Square between two competing double-decker tour bus companies. Specifically, Plaintiff Go New York Tours, Inc., which operates under the TopView brand, brings claims against Defendant Aurora Tourism Services Inc., which operates as Iconic Tours, and its owner, Oluwabamise Jegede, for what it alleges is the unauthorized use of the TopView's trademark in street and online ticket sales. The Complaint states causes for trademark infringement, unfair competition, and false designation of origin, each under the Lanham Act *see* 15 U.S.C. §§ 1114(1), 1125(a), *et seq.*; unfair competition under New York common law; unlawful deceptive acts and practices under N.Y. Gen. Bus. L. § 349, *et seq.*; and trademark infringement under N.Y. Gen. Bus. L. § 133, *et seq.*

      Now before the Court is Plaintiff's motion for a preliminary injunction and temporary restraining order. Having considered multiple days of testimony—which demonstrated that the many and changing employment relationships between the tour bus operators and independent contractors in Times Square were unclear at best—and having evaluated the parties' additional affidavits and proposed exhibits, the motion is denied in its entirety.

## BACKGROUND

Two weeks after filing the Complaint, Plaintiff further moved for entry of a proposed preliminary injunction and temporary restraining order. *See* Dkt. 18. That proposed order included twenty (20) discrete requests, including, among other things, that Defendants be enjoined from infringing the TopView trademark or "any other intellectual property belonging to TopView;" from allowing employees or agents to claim that they are affiliated with TopView; from allowing employees or agents to make use of TopView materials, such as brochures, handouts, maps, signs, and clothing; from use of the TopView mark online; and from parking or stopping Iconic buses at stops assigned to TopView by the New York City Department of Transportation ("DOT"). *See* Dkt. 18 at 2–4. The Court set a timeline for briefing on the motion, and scheduled a hearing where witnesses could be called. *See* Dkt. 23. In advance of that hearing, Plaintiff filed affidavits for two witnesses, as well as several dozen exhibits; Defendants indicated their intention to call Defendant Oluwabamise Jegede at the hearing in opposition. *See* Dkts. 30–36.

The Court then heard two days of testimony on Plaintiff's motion. On the first day of the hearing, Plaintiff began by calling Asen Kostadinov, the President and Chief Executive Officer of Go New York Tours, which owns and operates tours under the TopView brand. *See* Tr. 12–33. As is this Court's typical practice, Plaintiff introduced direct examination of Kostadinov by way of affidavit. In sum and substance, Kostadinov testified that his company is one of two companies operating legitimate "hop-on, hop-off" double-decker sightseeing tour buses, the other being Taxi Tours, Inc., not a party to this action, which operates under the Big Bus Tours brand. Kostadinov Aff. ¶¶ 6–7. He explained that the business model is designed such that tourists are able to purchase a ticket for the TopView tour, start at any one of dozens of locations throughout New York City, and then "hop off" the bus to visit iconic sites and attractions—including the Empire

State Building, the Metropolitan Museum of Art, and Rockefeller Center.  *Id.* ¶ 8.  Customers are then able to "hop back on" TopView buses from any of the specified locations without having to wait for lengthy time periods, given that multiple buses are continuously operating along the same designated routes.  *Id*.  Attached to his affidavit were TopView maps and brochures which indicated how tourists made use of the tour bus service:



Kostadinov Aff., Ex. 3 at 2–3.  Kostadinov further explained that TopView "assiduously strives to

3

maintain and protect its brand" and to "distinguish itself from other tourist companies," and that the company is one of only two (along with Big Bus Tours) to be licensed by the DOT to operate double-decker buses at stops throughout the City. *Id.* ¶ 12. As part of TopView's effort to protect its brand, Plaintiff obtained a federally registered trademark for the mark "TOPVIEW." *Id.* ¶ 13 (listing USPTO Reg. No. 5,522,838).

To sell tickets to tourists, TopView has authorized agents operating at popular tourist locations such as Times Square and the Empire State Building, *id.* ¶ 15; and, in order to attract sales, Kostadinov testified that TopView's name and logo is prominently displayed on bright signs held by authorized agents, "official brochures" that they distribute, maps which contain the "official 'TopView' logo," and on the agents' bright red t-shirts, jackets and hats containing the same logo, *id.* ¶¶ 16, 18. TopView also advertises and sells tickets online, including at its official website (www.topviewnyc.com), and on third-party sites such as Trip Advisor, Google, Groupon, and Viator, all under the "TopView" brand. *Id.* ¶ 17. Kostadinov further testified that, to maintain its brand, each of TopView's buses are painted red with blue and white trimming and bear the distinctive TopView logo. *Id.* ¶ 17.

In support of Plaintiff's request for immediate injunctive relief, Kostadinov testified that he had "personally observed" Defendant Iconic's "ticket agents, drivers, and other employers [sic] impersonating TopView employees and ticket agents by wearing clothes with TopView's trademarked logo, holding up TopView's map and pretending it is Iconic's and handing out TopView brochures to the public." *Id.* ¶ 25. He offered specific detail on several such encounters, including one in August 2022, when he "personally caught an Iconic worker wearing a red shirt with the TopView logo." *Id.* ¶ 32. He also offered photographic evidence which he claimed showed Iconic worker swearing the TopView brand, including the following:

4



Kostadinov Aff., Ex. 8.

After describing other similar encounters and referencing additional alleged photographic evidence of Iconic employees using the TopView brand without authorization, Kostadinov testified that consumers had been confused by this advertising and were often incorrectly placing the blame for poor experiences on TopView. *Id*. ¶¶ 69–71. One individual, for instance, emailed the TopView email account about an incident he described as involving "TopView employees at the Night Tour stop in Times Square," which involved waiting on the bus for nearly an hour, "aggressive" ticket seller behavior, and even police intervention. *Id*. ¶ 71 (citing Kostadinov Aff., Ex. 21). After TopView responded to the customer and clarified that it was not the tour bus operator responsible for the incident, the customer then responded thanking TopView for being "accommodating . . . despite [the] company being unfairly accused of being involved." *Id*. ¶ 72 (citing Kostadinov Aff., Ex. 22).

Lastly, Kostadinov testified regarding Defendant Iconic's apparent use of the TopView mark online, including via advertisements posted on Groupon. *Id*. ¶¶ 83–86. Some such advertisements referred to Iconic as the "Best Rated Top Viewing New York Bus and Boat Tours"

5

and the "Top Viewing Bus Tour in NYC." *Id.* ¶ 85; *see also* Kostadinov Aff., Exs. 25, 26.

On cross-examination, however, Kostadinov appeared to walk back several of his key allegations. When questioned regarding the individual photographed wearing the TopView branded red polo shirt in Plaintiff's Exhibit 8, for instance, he indicated, first, that the individual "may have worked for TopView in 2021," and, eventually, agreed that the individual was, in fact, "an independent contractor with TopView" in the past. Tr. 88. After claiming that he did not know the man's name, *id.* at 94, and denying that he had intentionally withheld information related to the individual's prior independent contractor relationship with TopView, *id.* at 95, Kostadinov agreed that the man's uniform looked like a "TopView uniform" that

Plaintiff also presented the similar testimony of Jennifer Li, the head of marketing for TopView, who took photographs during the summer of 2022 of what Plaintiff alleged were Iconic ticket agents "impersonating TopView and other bus companies' agents," including by wearing TopView branded clothing and distributing TopView brochures. Li Aff. ¶ 5; *see also* Li Aff., Exs. 1–3. On cross, however, when questioned regarding the individuals she had photographed purportedly improperly using the TopView brand, Li acknowledged that she did not "know their employment status with TopView." Tr. 143. She further acknowledged that TopView uses "ticket sellers," and that she did not know whether such sellers were "employees" or worked "independent on contract." *Id.* 144.

Defendants continued pressing the case that the associations between tour bus companies and independent contractors were murky, at best, during the second day of the hearing. They called Opeyemi Jegede, for instance, an Iconic employee, who testified that the individual pictured in Plaintiff's Exhibit 8, who she identified as "Mr. Amar," was captured by her on video explaining to the police that he *did*, in fact, work for TopView. *See* Tr. 171 ("He, himself said, [t]his is my

6

company, TopView, and he went inside [his] pocket and said, [this] is our brochure, TopView, and he gave it to the police."); Def. Ex. 25 (video of same). Jegede further expressly denied that Mr. Amar "ever work[ed] for Iconic," as Kostadinov had alleged, including at the time he was photographed by Plaintiff's representative. *See* Tr. 199. Jegede also contested the allegations that she ever used TopView-branded maps when selling tickets to customers in Times Square; rather, she explained, Plaintiff's photographs depicted her holding a map that was "absolutely different" from TopView's map and that she had "create[d] [the map] from Google." Tr. 224. Going even further, she testified that consumer confusion regularly ran in the other direction; she explained, for instance, that TopView agents and ticket sellers regularly stand in front of Iconic tour buses, and the Defense introduced photographs she took of the same. *See* Tr. 178–79; *see also* Tr. 186–87 ("This sign misleads customers. This sign make[s] people think it is a TopView bus.").

Perhaps most significantly, the Defense next called the individual pictured in Plaintiff's Exhibit 8, Sergine Amar, who testified that he had previously worked as an independent contractor for Plaintiff TopView, contrary to Kostadinov's initial insistence otherwise:

> Q: [A]t one time, did you enter into an independent contractor agreement with TopView?
> A: I work for TopView maybe one year, something like that
> . . .
> Q: Did you sell tickets for TopView at some point?
> A: Yeah, some point I work—I sell ticket for TopView.

Tr. 261–63. Indeed, the Court sought to clarify with Mr. Amar whether he had worked to advertise for Plaintiff TopView, and he indicated that he had. *See* Tr. 264 ("I was selling tickets in Time [sic] Square. When I was working at TopView, I sell ticket when I was at TopView."). Specifically, Mr. Amar testified that, while advertising for TopView, he would take prospective customers to TopView representatives who would then sell the tickets to the customers directly; Amar, in turn, would receive a commission for securing the sale. *See id*. (Amar testified that, if

7

"somebody need ticket . . . TopView they sell it"); *see also id.* at 265 ("THE COURT: So if the person, the tourist is buying a ticket from TopView, then the ticket seller for TopView gives you a commission? THE WITNESS: Yes. That's what I do."). Although his testimony on the point was somewhat unclear, Mr. Amar also indicated that he had worked in some capacity selling tickets with Defendant Iconic as well, and that he had worn TopView branded clothing on at least one instance while doing so. *See* Tr. 271 ("The first time when Iconic—beginning, the lady come to me with her sign. They give me sign. If you want to help us, you can help us. For me, I don't work for anybody. I say, okay. If I have customer, I can give to you."). The Court then specifically questioned Mr. Amar regarding whether the Iconic representatives had authorized him wearing TopView-branded clothing, or had otherwise indicated that doing so while selling Iconic tickets; Mr. Amar declined that Iconic had ever done so. *See* Tr. 273 ("THE COURT: Did anyone from Iconic say it was okay to wear the shirt? THE WITNESS: No. . . . THE COURT: [W]hen you wore it, did you talk to people from Iconic? THE WITNESS: No.").

Moreover, although Mr. Kostadinov previously testified that he was uncertain regarding TopView's relationship with Mr. Amar as an independent contractor, when he was recalled during the second day of the hearing, his testimony changed considerably. He testified, for instance, that Amar was an independent contractor for TopView, *see* Tr. 298, but that his "contract was terminated" when he "broke company policy"—specifically, by "wearing the TopView uniform while he was on a line to buy Broadway show tickets"—and thereafter refused to pay a "reactivation fee" necessary to reinstate his contract, *see* Tr. 299.

After the second day of the hearing, at the request of the parties, the Court referred the action to Magistrate Judge Willis for general pretrial issues and a settlement conference. *See* Dkt. 49. The Court also issued an order adopting the parties' stipulation of non-infringement, ordering:

1. During the pendency of this action, Defendants' employees, representatives, affiliates, ticket sellers operating as agents or representatives, or other, or other persons associated with Aurora (henceforth, "Aurora Associated Persons") shall not, on its website, infringe on the federally registered trademark for the standard characters TOPVIEW, Federal Registration No. 5522838 (the "TopView Mark").

2. Defendant shall remove the words "Top-View" and "Top-Viewing" from any website operated or controlled by Aurora and Aurora Associated Persons.

3. Aurora shall not publish on its website to suggest that there is an association between Aurora and TopView.

Order, Dkt. 50. The order further noted that counsel had "indicated that they will continue to discuss the terms" for a more expansive "stipulation of non-infringement to remain in place during the pendency of the action" before Magistrate Judge Willis. *Id*. 3. Accordingly, several weeks thereafter, the parties appeared before Judge Willis; at that conference, unfortunately, the parties could not even "reach agreement about what date [they] could come to have [a] settlement conference." Tr., Dkt. 60 at 6. The parties were thus unable to stipulate as to any additional terms, and requested a continuation of the hearing before this Court on the proposed preliminary injunction and temporary restraining order.

In the days immediately before the third day of testimony, Plaintiff filed indicated that it intended to present the testimony of four witnesses—Asen Kostadinov, Jennifer Li, Jonathan Hengal, and Opeyemi Jegede. *See* Dkts. 77–80. Based on the new affidavits, Li was to have been recalled to testify regarding Defendant Iconic's use of the TopView trademark on its website. *See* Dkt. 80. Hengal, the Vice President of Plaintiff Go New York Tours, was to have testified regarding conversations he had with the DOT about Iconic "consistently imped[ing] the smooth flow of traffic" by operating its buses, without authorization, in bus lanes. *See* Dkt. 77. And Kostadinov and Jegede were to have continued their testimony based upon the same affidavits submitted prior to the second day of the hearing. *See* Dkt. 71.

Defendant, in turn, indicated that it intended to call two witnesses, Oluwabamise Jegede and Karl Martin. *See* Dkt. 71. Defendants also filed their own motion for a preliminary injunction enjoining Plaintiff's employees from "bother[ing], threaten[ing], intimidat[ing], harass[ing] and/or interfer[ing] with Defendant's customers." Dkt. 72. Defendants further indicated that they intended to introduce evidence that a criminal complaint for misdemeanor assault had recently been filed against an alleged employee of Plaintiff related to an apparent altercation which occurred shortly before the hearing was set to take place, and that the altercation was captured on video and would be introduced into evidence. *See* Dkt. 73.

Following receipt of the affidavits for each of the proposed witnesses, the Court adjourned the third day of the hearing, *see* Dkt. 84, having determined, as explained in further detail below, that, even accepting all of the proposed testimony as true, the Court would deny Plaintiff's proposed preliminary injunction and temporary restraining order.

The Court understands that the parties continue to engage in discovery related to the claims in the underlying Complaint, which is currently set to conclude in March 2024, *see* Dkt. 99, and that they have reached agreement regarding a protective order governing the handling of any confidential materials, *see* Dkt. 102. The Court has also referred this case to Magistrate Judge Willis for a settlement conference, although the parties recently requested that such conference be adjourned *sine die* as discovery remains underway. *See* Dkt. 100.

## LEGAL STANDARD

"In the Second Circuit, the same legal standard governs the issuance of preliminary injunctions and [TROs]." *Mahmood v. Nielsen*, 312 F. Supp. 3d 417, 421 (S.D.N.Y. 2018). To obtain either, a party must demonstrate: "(1) a likelihood of success on the merits …; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships

tips in [the requesting party's] favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015). The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," and a "party is thus not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made" at a preliminary injunction hearing are "not binding at a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

The Federal "[R]ules of [E]vidence do not apply to a hearing on a motion for a preliminary injunction." *Zeneca, Inc. v. Eli Lilly & Co.*, 1999 WL 509471, at *2 (S.D.N.Y. July 19, 1999). Rather, as the Second Circuit has observed, "[t]he admissibility of hearsay under the Federal Rules of Evidence," for instance, "goes to weight, not preclusion, at the preliminary injunction stage." *Mullins v. City of N.Y.*, 626 F.3d 47, 52 (2d Cir. 2010). Specifically, "affidavits can be considered in connection with a motion for a preliminary injunction." *Williams v. Rosenblatt Sec. Inc.*, 2016 WL 590232, at *2 (S.D.N.Y. Feb. 11, 2016).

## DISCUSSION

The Court has considered the testimony, affidavits, and exhibits introduced by the parties, and has given more weight to those exhibits for which witnesses testified that they had personal knowledge. The Court has further given less weight to those exhibits for which a foundation for eventual admissibility at trial has not yet been laid, although they were still considered for purposes of the present motion. *See Mullins*, 626 F.3d at 52 (at a preliminary injunction hearing, the admissibility of evidence "goes to weight, not preclusion").

For the reasons that follow, the Court finds that the requirements for issuing a preliminary injunction and temporary restraining order have not been met in this action. *See Winter v. Natural*

*Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Sallinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010).

> I. **Plaintiff Has Not Demonstrated a Likelihood of Success on the Merits of its Lanham Act Claims**

To succeed on a claim of trademark infringement, a plaintiff is tasked with proving: (1) that it has a valid trademark used in commerce, and (2) that the mark was infringed by the defendant in a manner likely to cause consumer confusion. *See BBK Tobacco & Food, LLP v. Galaxy VI Corp.*, 408 F. Supp. 3d 508, 520–21 (S.D.N.Y. 2019). Contrary to Defendants' arguments at the hearing and in their written submissions, trademark infringement claims do "not require [a party] to prove that [the defendant] intended to infringe on its trademark, as such a claim does not require proof of intent to deceive." *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 83 (2d Cir. 2013). Put differently, the "right to protection from trademark infringement is not dependent upon a showing of wrongful intent." *Source Perrier, S.A. v. Waters of Saratoga, Inc.*, 1982 WL 51044, at *4 (S.D.N.Y. Dec. 9, 1982); *see also Monster, Inc. v. Dolby Lab'ys Licensing Corp.*, 920 F. Supp. 2d 1066, 1075 (N.D. Cal. 2013) ("Proof of intent to confuse or deceive consumers is not necessary to establish trademark infringement, and lack of such intent adds nothing to the likelihood of confusions analysis.").

Here, Plaintiff has certainly established that it is the owner of the federally registered trademark for the mark "TOPVIEW." *See* USPTO Reg. No. 5,522,838; *see also* Kostanidov Aff., Ex. 1 (USPTO Certificate). But while Plaintiff's affidavits, attached exhibits, and live testimony established that *some* individuals may have infringed the mark in a manner "likely to cause consumers confusion as to the origin or sponsorship" of certain tour bus products and services, *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 102 (2d Cir. 2010), Plaintiff's evidence, at this stage, falls short of establishing that Defendants were responsible for such infringement. Rather, the

testimony that the Court heard over multiple days, in conjunction with the submitted affidavits, indicates that the normal practice among businesses in this industry—including by Plaintiff TopView and Defendant Iconic—is to employ independent contractors to advertise their tour products and services. Because the only evidence of apparent infringement adduced relates to the activities of such independent contractors—and, critically, becasue no evidence has been offered demonstrating that any such contractors were operating at Defendants' behest—Plaintiff fails to demonstrate that it would likely succeed on its Lanham Act claims *as against Defendants*.

Plaintiff relies in significant part on the testimony of Asen Kostadinov, both by affidavit and at the hearing, that he has "personally observed" individuals "impersonating TopView employees and ticket agents by wearing clothes with TopView's trademarked logo, holding up TopView's map . . . and handing out TopView brochures to the public." Kostadinov Decl. ¶ 25. He testified, for instance, that, in July 2022, on Seventh Avenue between 44th and 45th Streets, he had an argument with individuals pictured in certain of Plaintiff's exhibits regarding their use of TopView-branded clothing, maps, and brochures while advertising competing services. *Id*. ¶¶ 25–33. He described, moreover, that he witnessed these individuals using a map that is posted on TopView's website while providing information related to competing tour products or services. *Id*. And he further identified the individual pictured in Plaintiff's Exhibit 15 as having TopView brochures in her back packet. *Id*. ¶¶ 55–59. In Kostadinov's telling, he continued to witness individuals using TopView brochures throughout the 2022 holiday season. Tr. 68–69.

To be sure, Kostadinov's account was lent some support by photographic documentation of apparent infringement by at least some individuals. One key photo, for instance, appears to show an individual passing himself off as a TopView representative or affiliate by wearing a TopView-branded red polo shirt, lending credence to the notion that consumers may have been

13

confused about whether he had an association with the TopView brand. *See* Kostadinov Aff., Ex. 8; *see also* Kostadinov Aff. ¶ 33. In addition, as Kostadinov *initially* testified, to the extent that individual had no relationship with the TopView brand at the time that the photograph was taken, Tr. 88, such activity could constitute trademark infringement. Moreover, Plaintiff demonstrated that at least some activity resulted in actual consumer confusion. Plaintiff provided email correspondence from one customer, Eric Borg, for instance, who purchased tickets from Defendant Iconic, was dissatisfied by sub-par service—which included waiting on a bus for more than an hour—and was then told to contact TopView to lodge a complaint. *See* Kostadinov Decl. ¶¶ 69–72; Exs. 21, 22. After the police intervened, Borg contacted Plaintiff and said that he appreciated Plaintiff's offered accommodation "despite [TopView] being unfairly accused of being involved." Ex. 22.

Critically, however, the testimony introduced at the hearing also indicated that it is far from clear whether the independent contractors using the TopView branded brochures or wearing TopView branded clothing were working for Defendant Iconic at the time of any alleged infringement.[1] There was extensive testimony, for instance, about the overlap between independent contractors at each of the various companies in the industry. *See, e.g.*, Tr. 254 (testimony of Oluwabamise Jegede); Tr. 261–63 (testimony of Sergine Amar). Based upon that testimony, it appears that companies within this tour bus industry make use of a host of individual

---

[1] As an aside, the law is at least somewhat unclear as to whether a trademark infringement claim may ever be stated against a defendant entity for the infringing activity of its independent contractors. Other district courts have found, however, that because the Lanham Act is "silent as to secondary liability for another's direct infringement, common law tort and agency principles apply" in such contexts. *Coach, Inc. v. Sapatis*, 27 F. Supp. 3d 239, 244 (D.N.H. 2014). Accordingly, many courts have concluded that a trademark infringement claim may be stated where an independent contractor acts with apparent authority, given that, under common law agency principles, any such activity could be attributed to the principal. *See, e.g., 1-800 Contacts, Inc.v . Lens.com, Inc.*, 722 F.3d 1229 (10th Cir. 2013); *American Telephone and Telegraph Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1321, 1343–45 (3d Cir. 1994). In any event, the Court need not reach the question of the Lanham Act's reach here, because Plaintiff has adduced no evidence demonstrating a certain agent-principal relationship between the Defendants and the alleged infringers.

independent contractors who work in Times Square to advertise for tour bus operators on an ad-hoc basis. Indeed, the very individual that Plaintiff photographed across multiple exhibits to the Kostadinov affidavit, Mr. Sergine Amar, testified that he was previously an independent contractor working with Plaintiff TopView. Tr. 261–63. And when the Court sought to clarify with Mr. Amar whether he had worked to advertise for Plaintiff TopView in any capacity in the past, he indicated that he had. *See* Tr. 264

In light of Mr. Amar's testimony, which the Court found credible, and given Mr. Kostadinov repeatedly backing away from his initial accusations that Amar was affiliated with Iconic—both on cross-examination, *see* Tr. 88, 94–95, and at the second day of the hearing, *see* Tr. 298–99—the weight to be given to Plaintiff's photographs of Amar wearing TopView-branded clothing is significantly diminished. The evidence at the hearing did not support the notion that, at the time Amar was photographed wearing the TopView brand, he was working for Iconic and creating consumer confusion as a result. If anything, it appears equally likely, on the present record, that this is an industry where many independent contractors in Times Square work for multiple tour bus operators on a regular basis, and may thus be advertising different services from one day to the next.

Under these circumstances, the Court cannot conclude at this early stage that Plaintiff has established a likelihood of success on the merits of its infringement claims against Defendants.

## II.     **Plaintiff Has Not Demonstrated a Likelihood of Irreparable Harm**

Plaintiff, moreover, has not demonstrated a likelihood of irreparable harm if injunctive relief does not issue. Typically, pursuant to 15 U.S.C. § 116(a), "[a] plaintiff seeking any [preliminary] injunction shall be entitled to a rebuttable presumption of irreparable harm upon . . . a finding of a likelihood of success on the merits." Critically, however, the Second Circuit has

observed that "any such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995). Here, Plaintiff alleges that it has known about the infringing activity complained of since at least July 2022, *see* Kostadinov Decl. ¶¶ 22–29, but did not seek injunctive relief until January 2023, *see* Dkt. 18. Thus, even if Plaintiff had demonstrated a likelihood of success on the merits of its infringement claims, no presumption of irreparable harm would attach, as Plaintiff did not bring this suit or seek injunctive relief for half a year after learning of, and documenting, the alleged infringing activity. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (observing that the "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury") (cleaned up); *see also id*. at 276 (finding that even a ten-week delay from discovery of alleged infringement to the commencement of a lawsuit destroys any presumption of irreparable harm).

In the absence of such a presumption, Plaintiff has failed to establish a likelihood of irreparable harm, as, significantly, the evidence demonstrated that independent contractors like Mr. Amar regularly advertise for multiple tour operators within the industry. *See, e.g.,* Tr. 261–63. Accordingly, the Court is not convinced that TopView will suffer such harm that will lead it to "lose control over the reputation of its trademark" were it to await any relief until the conclusion of a trial on the merits. *See McDonald's Corp. v. Kristina Denise Enterprises, Inc.*, 189 F.3d 461, 461 (2d Cir. 1999) ("Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial."). The Court "must actually consider the injury the plaintiff will suffer if [it] loses on the preliminary injunction but ultimately prevails on the merits," giving attention "to whether the remedies

available at law, such as monetary damages, are inadequate to compensate for that injury." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010); *see also eBay Inc. v. Merc Exchange, LLC*, 547 U.S. 388, 391 (2006). Because Plaintiff has not here met its burden of "demonstrat[ing] that, in the absence of a preliminary injunction," it is "likely to suffer irreparable harm before a decision on the merits can be rendered," *Salinger*, 607 F.3d at 80, this factor does not weigh in favor of granting the motion.

### III.     The Remaining Factors Do Not Weigh in Favor of Granting the Injunction

Finally, the Court concludes that the balance of equities and public interest also do not weigh in favor of granting Plaintiff's proposed preliminary injunction and temporary restraining order. On the basis of the live testimony and submitted affidavits, the balance of equities is at most neutral, given that it appears that individuals associated with both businesses have engaged in advertising behavior that could result in consumer confusion. *See* Tr. 178–79, 186–87 (testimony indicating large crows of TopView employees advertise in front of Iconic buses by blocking them with TopView signs). Nor would the public's interest necessarily be advanced by granting the preliminary injunction Plaintiff seeks at this stage. To be sure, "the public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y.C. Triathlon, LLC v. N.Y.C. Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010); *see also SK & F, Co. v. Premo Pharm. Labs, Inc.*, 625 F.2d 1055, 1067 (3d Cir. 1980). Here, however, given that Plaintiff has failed to demonstrate that the particular injunctive relief it seeks against Defendants Iconic and Jegede would serve that purpose, the public interest factor is at most neutral.

\*     \*     \*

"A preliminary injunction is an extraordinary remedy never awarded as of right," and

"courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 22. An injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. The "failure to establish any element [of the *Winter* test] renders a preliminary injunction inappropriate," *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999), and, here, Plaintiff has failed to meet its burden of demonstrating that any of the factors weigh in its favor. Accordingly, the motion for preliminary injunctive relief is denied.

## CONCLUSION

Nothing in this opinion and order should be read to suggest the Court's view as to whether Plaintiff will ultimately be able to prevail on the merits of its Lanham Act and state law infringement claims. Rather, the Court here only concludes that Plaintiff has failed to meet its burden justifying issuance of a preliminary injunction and temporary restraining order at this early stage of the litigation. The previous stipulation of non-infringement related to use of the TopView mark online shall remain in place during the pendency of this action. *See* Order, Dkt. 50. The parties are reminded, moreover, that no entity or individual in this industry should require a Court order to prevent them from infringing activity which violates the law.

For the foregoing reasons, Plaintiff's motion for a preliminary injunction and temporary restraining order is denied. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 18.

SO ORDERED.

Dated: September 21, 2023
New York, New York

Hon. Ronnie Abrams
United States District Judge

18